IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

**FILED** 2017 MAY 19 PM 1:26

Plaintiffs, Spot Quote Holdings, Inc. a Delaware Corporation (formerly named Deep Liquidity, Inc.), Spot Quote LLC a Texas Limited Liability Company (formerly named Deep ATS LLC) and Sam Balabon, a natural person.

vs.

Defendants, Robert Cook, Richard Ketchum, Erin Vocke, Scott Maestri, natural persons and Financial Industry Regulatory Authority, Inc., a Delaware Corporation

Case No.: No. [case number]

**COMPLAINT**

**A17CV0486 LY**

**JURY TRIAL DEMANDED**

**PLAINTIFFS**

1. Spot Quote Holdings, Inc. ("Spot Holdings") a Delaware Corporation formally named Deep Liquidity, Inc.
2. Spot Quote LLC ("Spot") a Texas Limited Liability Company formally named Deep ATS LLC. and a wholly-owned subsidiary of Spot Holdings
3. Sam Balabon ("Mr. Balabon") a natural person.

**DEFENDANTS**

4. Robert Cook ("Cook") a natural person.
5. Richard Ketchum ("Ketchum") a natural person.
6. Erin Vocke ("Vocke") a natural person.
7. Scott Maestri ("Maestri") a natural person.
8. Financial Industry Regulatory Authority, Inc., ("FINRA") a Delaware Corporation.

**ABSTRACT OF ACTIONS**

9.  First action is a deliberate violation of Section 15(A)(f) of the Securities Exchange Act of 1934 by the Financial Industry Regulatory Authority, Inc. ("FINRA"), a self-regulatory organization ("SRO") acting under authority of the U.S. Securities and Exchange Commission ("SEC") when it invented a new FINRA Rule that gives FINRA the authority to regulate affiliate companies of broker dealers.

10. Second action is a deliberate violation of Title 18 U.S.C. § 3 by current FINRA CEO Cook and prior FINRA CEO Ketchum for concealing a crime from the Securities Exchange Commission ("SEC") that was committed by FINRA Management against Plaintiffs. The law states:

   **18 U.S. CODE § 3 – ACCESSORY AFTER THE FACT**
   **Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the**

**offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.**

11. Third action is pain, suffering and emotional distress imposed on Mr. Balabon due to FINRA's illegal interactions with him as an individual. Mr. Balabon is in his 50s.

### FEDERAL FELONY COMMITTED BY FINRA

12. FINRA illegally attempted to hijack the distribution of securities of Spot Holdings (a non-broker dealer) by ordering Spot Holdings to stop selling securities directly to investors and further ordered, any additional offer and sale of Spot Holdings securities would have to be sold through Spot (a firm FINRA regulated). It harmed Spot by forcing it out of dormancy which would subject itself to additional FINRA Rules and FINRA Examinations such as FINRA's Sales Practice Examination. It harmed Spot Holdings because it limited its ability to distribute its own securities. It gave FINRA greater authority to influence how Spot Holding's securities were to be sold and represented to investors. It increased the regulatory burden on Spot and the cost to maintain the broker dealer. FINRA only administers FINRA Rules, it is prohibited from inventing new FINRA Rules unless they go through a formal public comment process that takes many months. If this occurs, it clearly violates Section 15(A) (f) of the Securities Exchange Act of 1934:

> **Nothing in subsection (b)(6) or (b)(11) of this section shall be construed to permit a registered securities association to make rules concerning any transaction by a registered broker.**

13. Securities Exchange Act of 1934 states:

> **"ANY" person who "WILLFULLY" violates "ANY" provision of the Securities Exchange Act of 1934 can be fined up to $5,000,000 and/or imprisoned for not more than 20 years.**

14. Securities Act of 1934 also has specific provisions regarding the selling of private placements and requires separate registrations for broker dealers that seek to sell them.
Section 15(A)(j) of the Securities Exchange Act of 1934:

> **(j) REGISTRATION FOR SALES OF PRIVATE SECURITIES OFFERINGS**
> **A registered securities association shall create a limited qualification category for any associated person of a member who effects sales as part of a primary offering of securities not involving a public offering.**

15. To comply with Section 15(A)(J) of the Securities Act of 1934 FINRA created FINRA RULE 1017(5):

> **Rule 1017 Application for Approval of Change in Ownership, Control, or Business Operations. (5) a material change in business operations as defined in Rule 1011(k).**

### BACKGROUND

16. Spot obtained its broker dealer and alternative trading system (ATS) licenses in 2006. These licenses were necessary for Mr. Balabon to commercialize his inventions that relate to how stocks trade. Spot never conducted any business since its inception. Its total gross sales

between 2006 and 2012 were zero. Spot was deemed a "dormant" broker dealer company by its own auditor. It basically was a shell broker dealer license waiting for a capitalization event to effectuate its business plan. The capitalization event never occurred. This was due to the project's inability to raised enough capital to commercialize Mr. Balabon's inventions.

17. In December 2012, Mr. Balabon got in an argument on the phone with the FINRA District Director Vocke of FINRA's Dallas Office over what FINRA's responsibilities were to their members. The FINRA District Director Vocke got upset and hung up on Mr. Balabon. Mr. Balabon felt the tone and demeaner of the FINRA Official was threatening and going forward this FINRA Official would pursue an effort to harm Spot and Mr. Balabon personally. Mr. Balabon emailed a written complaint on the FINRA District Director Vocke to the FINRA CEO Ketchum. Except:

**"Miss Vocke has engaged in clear misconduct towards myself and my affiliates."**

We believe FINRA District Director Vocke was furious once she learned that Mr. Balabon went over her head to complain to FINRA CEO Ketchum. We believe from that point on FINRA District Director Vocke set out to punish Mr. Balabon. This set the stage to what was to come.

18. In the same month FINRA rented some offices to do their Cycle Examination of Spot. Two FINRA Examiners spent two full days with Mr. Balabon at these offices asking Mr. Balabon questions and going over his computer records of Mr. Balabon's money raising efforts for Spot Holdings. Since Spot was a dormant broker dealer it had no business records to review.

19. In May of 2013, as part of the same FINRA Cycle Examination, FINRA decided that it wanted to interrogate Mr. Balabon with attorneys present along with a court reporter. Mr. Balabon was not represented by an attorney due to lack of finances. He had to represent himself. FINRA represented itself with its Head Attorney and the Head of their Examinations of FINRA's Dallas Office. The interrogation with the court reporter occurred in Austin for a full day at a FINRA rented office in Austin. These two FINRA officials from morning to evening interrogated Mr. Balabon on his money raising activities for Spot Holdings and Mr. Balabon's personal finances with the court reporter. There were few if any questions about Spot itself; the business entity they were regulating. Spot had no business activity since inception. The interrogation did not go well for FINRA. Nothing useful was discovered that could be used against Spot or Mr. Balabon.

20. We believe that the news of the failed interrogation frustrated FINRA's management particularly the FINRA Associate District Director Maestri of the Dallas Office. We believe this lead to the FINRA Associate District Director Maestri coming up with the idea to illegally order Mr. Balabon to sell Spot Holdings securities through Spot. We also believe this illegal order was taken to and approved by the FINRA District Director Vocke. We believe never in the history of the NASD and now FINRA has there been an interrogation related to the affairs of a "dormant" broker dealer. We don't believe FINRA has ever imposed a "made-up" illegal FINRA Rule upon a broker dealer it regulates. This was an attempt to harm Spot and Mr. Balabon first by using legal means to seek out Mr. Balabon's improprieties but when they found none they resorted to unprecedented measures (interrogation) along with the fabrication of an illegal regulation.

21. In October of 2013, FINRA had an Exit Interview to the FINRA Cycle Examination for Spot. As part of every FINRA Cycle Examination there is an Exit Interview meeting between the FINRA Member and the FINRA staff to go over the findings of the examination. This interview with four FINRA representatives took place on October 31, 2013 by way of a conference call. During the call, it was explained to Mr. Balabon that he would have to discontinue selling Spot Holdings securities directly to investors from Spot Holdings and any future sales of Spot Holdings securities would have to be sold through Spot. This made Spot Holdings an investment banking customer of Spot, subject to all FINRA Rules on how investment banking clients are handled along with the exact manner their securities are distributed to the public. This meant that future investors of Spot Holdings would have to write their checks directly to Spot and then Spot would distribute the money to Spot Holdings. This order was intended to take Spot out of its dormancy and have it commence business as an investment banker which would require it to comply with a considerable number of FINRA Rules associated with the distribution of private securities through a broker dealer. At the time, Mr. Balabon had no idea this order was illegal.

22. In January 2014 Mr. Balabon reached out to the Director of Investment Banking at ViewTrade Securities to see if his firm could assist in the distribution of the Spot Holding's private securities. Mr. Balabon's email to the Director contained the following statement:

23. **"We are required by FINRA to sell these shares through our BD."**

24. In February 2014 Mr. Balabon along with George Hessler, the CEO of Spot Holdings, attended The National Investment Banking Association Conference in Florida. At the event, Mr. Balabon announced that he was

attempting to organize a selling group of broker-dealers to distribute Spot Holdings securities. This pursuit was contained in a video filmed by the Event and in literature that Mr. Balabon handed out. Unknown to Mr. Balabon, these communications made by him were a direct violation of Securities Exchange Act of 1934.

25. In March 2014, Mr. Balabon filed Spot Holdings Private Placement Memorandum with FINRA. The Memorandum stated in the very first paragraph in the document:

> **"This offering of the Units (the "Offering") is being made through Deep ATS LLC, (the "Managing Broker-Dealer")"**

Spot sold $20,000 of securities of Spot Holdings to an individual investor. This was the first investor to buy shares from Spot. This stock sale occurred under the new illegal FINRA Rule that was imposed on Spot by FINRA. The new illegal FINRA Rule was crafted by FINRA with intent to harm Spot. This increased FINRA's regulatory oversight over Mr. Balabon's selling efforts of Spot Holding's securities. We believe that Spot was the only FINRA regulated broker dealer in the country at the time and historically that could sell private placements without being formally approved for that business line by FINRA. Spot was singled out by FINRA to be punished under the new illegal FINRA Rule concocted by FINRA. FINRA hoped with increased regulation, Mr. Balabon would have a higher probability to make a mistake which they could punish Spot and him for.

26. In August 2014, FINRA notified Mr. Balabon that they were going to conduct a FINRA Sales Practice Examination. Purpose of a FINRA Sales Practice Examination is to review the sales practices of a firm on how they are distributing securities. FINRA wanted to see Spot's sales

practices and how Mr. Balabon was selling Spot Holdings securities through Spot. Spot had the one $20,000 sale of securities in behalf of Spot Holdings. This was a new type of examination and the first time it was imposed on Spot. Up until this time only FINRA Cycle Examinations required under the Securities Exchange Act of 1934 were conducted. No other types of FINRA Examinations were ever necessary due to the fact Spot had never conducted any business and remained basically a shell company with zero sales from its inception that spanned over seven years.

27. In September of 2014, FINRA demanded the following (as part of their Sales Practice Exam of Spot):

**"Please provide all of the E-Mails for Sam Balabon for the entire review period."**

The review period was for 12/04/2012 to 09/08/2014, a period of time Spot was dormant other than the $20,000 security sale that went through Spot. Such a request meant that FINRA wanted to inspect all of Mr. Balabon's emails not only his business emails but also Mr. Balabon's personal emails. Mr. Balabon pointed out that any request from FINRA for personal emails was illegal and not supported by any FINRA Rule. He told them that he would not comply.

28. In September of 2014, Mr. Balabon sent his FINRA representative in Dallas an email containing the following text:

**"If FINRA wants me to continue selling Deep Liquidity's private placement through Deep ATS, LLC I want a letter from FINRA which states Deep ATS is allowed to sell private placements which**

> includes private placements of other companies. I want it added as a new business activity approved for the BD."

This letter lead to a heated phone argument with a FINRA Representative. On the call, Mr. Balabon could not get the FINRA Representative to agree to write the letter adding the business line to Spot. This was the first-time Mr. Balabon realized that something was very wrong. Mr. Balabon complained by email to FINRA's CEO Ketchum. FINRA's CEO Ketchum did nothing, however Mr. Balabon did receive a letter from FINRA stating the Dallas staff had **"no recollection"** of giving Mr. Balabon the order to sell Spot Holdings securities through Spot. This statement of **"no recollection"** is commonly used in the legal world to hide from the truth. It is a legal trick to evade a question. This communication tactic is typically used by criminals attempting to avoid justice not an entity that claims to be one with government such as FINRA. Mr. Balabon decided without any order from FINRA to stop selling Spot Holdings' securities through Spot. Mr. Balabon emailed FINRA CEO Ketchum,

> **"Deep ATS, LLC will no longer engage in the business activity of selling private placements."**

In October 2014, Mr. Balabon emailed FINRA's Chief Technology Officer requesting him to copy all the emails of a specific list of FINRA employees involved so the records could be preserved regarding internal communications within FINRA regarding the allegations contained in this Complaint. Excerpt:

> "As a member of this organization, I request you copy the email accounts (all emails sent and received) on Monday for all the below people for the dates specified: Years 2012, 2013 and 2014 to Date" "I want you to put this data on a disk and save it in a safe place in the event you receive: A. Subpoena from a U.S. Court" "These records may contain evidence of wrongdoing and need to be immediately copied to preserve their integrity."

29. In November 2014, Mr. Balabon emailed FINRA CEO Ketchum a letter alerting him that a crime was committed by his staff.

30. In January 2015, FINRA wrote Mr. Balabon a letter stating that Spot was not approved to sell Spot Holdings securities. Excerpt:

> "The firm failed to comply with FINRA Rule 2210(d)(1)(b) in that Mr. Balabon stated in the YouTube video that "We are offering our private placement through our broker/dealer". As Deep ATS, LLC is not approved to conduct this type of business, this statement is inaccurate and misleading."

31. In February 2015, Wedbush Securities communicated to Mr. Balabon that Spot's clearing agreement with Wedbush was to be terminated due to pressure from FINRA.

32. In May 2015, FINRA removed the Dallas Regulatory Coordinator and assigned a new regulatory Coordinator from Boca Raton, Florida. This was part of a general move of the regulations of Spot from the Dallas FINRA District 6 to the Florida FINRA District 7 as promised by FINRA Dallas Director's boss the FINRA Regional Director of the entire South. This was a lie.

33. In October 2015, Spot filed a CMA application with FINRA to add the FINRA business line to distribute private placements through the broker dealer. The FINRA approval process to add the distribution of private placements through a broker dealer was fully illustrated in the long letters between FINRA and Spot that spanned over six months.

34. In May of 2016, Spot was approved to sell private placements.

35. In June 2016, during a conference call between Mr. Balabon, FINRA Surveillance Director of the Dallas Office and the Boca Raton FINRA Regulatory Coordinator, the Surveillance Director stated that FINRA "suggested" but did not "order" the sale of Spot Holding's securities through Spot at the end of the FINRA Cycle Examination in October 2013. FINRA Surveillance Director also told Mr. Balabon that further sales of Spot Holdings would have to be sold through Spot now that Spot was approved by FINRA to distribute private placements. Mr. Balabon angrily told the Surveillance Director that FINRA had no right to make such an order. Mr. Balabon stated the FINRA order was illegal and he would not comply. There is no FINRA Rule that permits FINRA to interfere with corporate matters of affiliated companies of broker dealers. Mr. Balabon then emailed the FINRA CEO Ketchum and threatened to file a lawsuit against FINRA. FINRA made no offer to settle and Mr. Balabon decided to shelve the lawsuit and hoped FINRA got the message to back off and quit harassing him with illegal orders.

36. In February 2017, Mr. Balabon learned that his firm was still being regulated by the Dallas FINRA District and not the Florida FINRA District as promised by the FINRA Regional Director. Mr. Balabon emailed FINRA's CEO Cook demanding Spot be allowed to switch Districts because of the promise made by the FINRA Regional Director.

37. April 2017, FINRA turned down Mr. Balabon's request to switch Districts. This made Mr. Balabon very angry. This meant the regulation

of his firm would be under the dominance of the FINRA District Director Vocke whom Mr. Balabon already accused directly of committing a Federal Crime. That outlook was unacceptable to Mr. Balabon. Mr. Balabon gave FINRA three days to change their minds or he was going to file a lawsuit in Federal Court on the third day. Exactly 10 minutes left before Mr. Balabon's deadline on the third day, FINRA emailed Mr. Balabon granting his request to switch Districts. Making the following statement:

> **"For reasons unrelated to your threat of litigation, FINRA is planning to move Spot"**

This statement is a badge of deception. It was clear why they changed their decision. FINRA lies all the time and no one cares.

The following email was sent to the Associate District Director Maestri, District Director Vocke, members of FINRA's General Council and FINRA's CEO Cook seeking an explanation for breaking the law:

> **"A. I have accused Scott Maestri of being the mastermind to the crime.**
> **B. I have accused Erin Vocke of being the ringleader. Scott and Erin, I am accusing you both of committing a federal crime. I want to encourage both of you if you feel you are innocent of these charges that I have made against you; please email me your defenses to my claims. I will review them as a fair jurist and if I find they have merit remove one or both of you from the lawsuit."**

Neither of the accused or FINRA Management responded to Mr. Balabon's email.

Mr. Balabon's anger can be viewed in an email sent to the FINRA District Director Vocke and Associate District Director Maestri, FINRA CEO Cook and four other top FINRA Officials. Excerpt from Email:

> **"Keep in mind I would not be working on this if it was not for FINRA's poor decision to initially deny the request to switch districts. Why does FINRA always have to be mean and nasty to people? Does your type of business attract humans that enjoy bullying people around? That is what is seems to me. Not all of them, certainly Erin and Scott are bullies. I have no problem calling them out on it either because it is true. They both possessed "evil" intentions against me and this hatred is why they broke the law. Simply unbelievable why people hate the way they do."**

## JURISDICTION AND VENUE

38. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

39. To date FINRA has enjoyed "absolute immunity" from civil litigation provided it is in connection with the discharge of their regulatory responsibilities, however engaging in the criminal act of inventing and enforcing an illegal FINRA Rule is outside this scope. Regulatory responsibilities must be legal acts as prescribed by FINRA Rules.

40. In general, we believe the Courts have errored in granting "absolute immunity" for FINRA in general. The cornerstone of "absolute immunity" relies on Eleventh Amendment to the Constitution.

41. Eleventh Amendment to the Constitution states:

> **The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.**

"One of the United States" was never meant by the delegates of the Constitutional Convention of 1794 to be "One of the United States combined with One of Private Enterprise." Nowhere in the Constitutional Amendment does it suggest, anticipate or allow such a combination. Private enterprise was well known at the time of the 1790s. There were many large corporations in those times such as the East India Company. It was well within the means of the "Committee of Detail" that wrote the Eleventh Amendment to include private enterprise in the text of the Constitutional Amendment. The founders of our Constitution knew the inherent conflicts of interest associated with combining government with private enterprise and choose to only include "one of government" in the Constitution. It would have been obvious at the time to combine private enterprise with government if that was intended. The result of the mixed enterprises is neither government nor private enterprise. There was good reason private enterprise was not mentioned because immunity from civil litigation was "only" to be granted to government and not private enterprise. The term "one of government" also speaks for itself, it is whole, all-inclusive and

singular. It does not mean a combination with private enterprise which leads to all kinds of conflicts of interest.

42. The level of distinction between "one of government" and "one of government combined with one of private enterprise" far exceeds the threshold of what "one of government" meant in those times. The combined entity is not government because the incentives of operation for private enterprise is profit and for government is public service. It is impossible to call the combination government; when it is not. The combination is a broadening of what "one of government" is. It is an expansion of the definition of the term "government." This was not intended by our Founders.

43. FINRA is not "one of government." In the 1930s after the stock market crash of 1929 Government in its pursuit to ever expand its power over the private sector interjected itself into the securities industry. This resulted in the introduction of a new legal corporate structure called Self-Regulated Organization ("SRO") which is a combination of government and private enterprise. SROs have from the beginning claimed they are agents of the government and claim they are owed all the protections afforded by the Constitution as if they were Government. The reality is that SROs are not Government but rather "for profit" businesses leveraging both their private and regulatory businesses for profit. SROs should no longer be able to enjoy absolute immunity from lawsuits and should be subject to civil liability for their actions unless they shed all their private enterprises and change their corporate structure.

44. FINRA is not "one of government" and by no means meets the definition of "one of government" as per the Eleventh Amendment to the Constitution. FINRA is a combination of government/private businesses that give it an unfair advantage over its private business competitors.

Granting immunity from civil litigation to an entity that is not government is unconstitutional.

45. FINRA is a Delaware Corporation that has private enterprises such as Alternative Display Facility (ADF) and a broker dealer regulatory business that is regulated by the Securities Exchange Commission (SEC). FINRA's top 10 executives all make over $800,000 a year with its CEO making close to $3,000,000 a year. Comparatively, the Chairman of the SEC makes less than $200,000 a year. Former FINRA CEO Mary Schapiro received nearly $9,000,000 payout when she left FINRA. FINRA has 23 people on its Board of Governors. None of them are part of the government. Under Delaware corporate law, FINRA Governors have a legal duty to advance the best interests of the corporation. U.S. Government employees on the other hand are public servants. Their duty is to preserve public trust and obey the Constitution, laws and ethical principles "above private gain." Legally, under current law, FINRA is considered an agent of the government but its employees' duty is to further the corporation by making more money for it. FINRA employees are not public servants by any means because they are not required to uphold the high standards of public service. FINRA's duty under Delaware Law is to pursue profit not pubic service. FINRA's and government's motives are opposite. One is to pursue profit and the other is specifically stated "not" to pursue profit.

46. FINRA enjoys all the benefits of being a private enterprise for profit and all the legal benefits of being government. This is unfair to Spot because it must compete directly with FINRA for customers without government powers or its protections. FINRA uses its government powers to harm its competitors and is willing to break the law to protect its interests.

47. Once Spot commences operations, it will be competing directly with FINRA's Alternative Display Facility ("ADF") business for trading volume. If Spot succeeds, FINRA's ADF business will be negatively affected. FINRA is Spot's direct competitor. How is it possible for FINRA to be an impartial jurist in deciding matters of the law as it pertains to Spot when it is in the financial interest of FINRA that Spot fail?

**PRAYER FOR RELIEF**

48. Plaintiffs request judgment in their favor and against Defendants as follows:

49. Awarding actual damages in favor of Plaintiffs against Defendants in an amount to be determined by the trier of fact.

50. Awarding punitive damages in favor of Plaintiffs and against Defendants in an amount no less than $150 million.

51. Awarding Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action.

52. For such further relief, the Court deems just and appropriate.

Dated this May 19, 2017

Spot Quote LLC & Spot Quote Holdings, Inc. & Sam Balabon

By  *S. BM*

Sam Balabon
3225 Smoky Ridge Road
Austin, TX 78730
5125854589